STATE OF NEBRASKA, APPELLEE, V. JAMES B. SOMMERS,
APPELLANT.

272 N. W. 2d 367

Filed December 13, 1978.   No. 42025.

Kirk E. Naylor, Jr., of Naylor & Keefe, for appel-
lant.

Paul L. Douglas, Attorney General, and Linda A. Akers, for appellee.

Heard before SPENCER, C. J., PRO TEM., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ., and RIST, District Judge.

SPENCER, C. J., PRO TEM.

Defendant appeals his conviction for the offense of motor vehicle homicide. The action was prosecuted as a felony by virtue of the allegation that he unlawfully operated his vehicle by having ten-hundredths of one percent or more by weight of alcohol in his body fluid. The case was tried to the court. There are two assignments of error: (1) Should the blood alcohol test have been suppressed because defendant was not afforded an opportunity to choose between a blood or urine test; and (2) was the evidence legally sufficient to find the defendant guilty of the crime charged. We affirm.

The information filed charged that defendant "did cause the death of Victor W. Johnson without malice while engaged in the unlawful operation of a motor vehicle, to wit: did unlawfully operate a motor vehicle while having ten-hundredths of one percent or more by weight of alcohol in his body fluid as shown by chemical analysis of his blood, breath, or urine."

In Pribyl v. State, 165 Neb. 691, 87 N. W. 2d 201 (1957), we said: "In an action charging motor vehicle homicide the burden is on the State to prove beyond a reasonable doubt that the person charged operated the motor vehicle in violation of one or more of the statutory provisons relating to the operation of motor vehicles."

The State had the burden to establish that defendant operated his motor vehicle while having ten-hundredths of one percent or more by weight of alcohol in his body fluid, as shown by chemical analysis of his blood, breath, or urine. It then had the further burden to establish that this unlawful act was a

proximate cause of the death of the deceased.

We consider the defendant's first assignment of error. Sommers was taken by ambulance to the Lincoln General Hospital. Officer Kawamoto was directed by a police radio call to obtain a blood specimen from him. With this purpose in mind he met Sommers in the emergency room at the hospital. Kawamoto testified he read the defendant the implied consent form used by the police department to inform an accused of his rights. After reading the form he directed the attending nurse to draw the blood for the test. Defendant complains the test should be suppressed because the officer did not give defendant an opportunity to elect between a blood or urine test. There is no merit to this assignment. This issue was settled in State v. Wahrman, 199 Neb. 337, 258 N. W. 2d 818 (1977). We there said: "Section 39-669.09, R. R. S. 1943, which provides that if the officer directs that the test shall be of the person's blood or urine, such person may choose whether the test shall be of blood or urine, does not require the officer to notify the person of his option, and if the person takes one or the other of these tests, then he has waived his right to insist that the test to be made by the State be the one of his choice."

The evidence clearly established that defendant was engaged in the unlawful operation of a motor vehicle as charged in the information. Chemical analysis of the blood sample, which was properly admitted, revealed sixteen-hundredths of one percent by weight of alcohol. Apart from the test evidence there was ample testimony from which it could be determined that defendant, at the time in question, was under the influence of alcoholic liquor.

The main issue on this appeal is whether defendant's unlawful operation of his vehicle was a proximate cause of the death of decedent. By "proximate cause" is meant a moving or effective cause or fault which, in the natural and continuous se-

quence, unbroken by an efficient intervening cause, produces the death and without which the death would not have occurred. See NJI No. 3.41.

The collision occurred at approximately 1 a.m., on March 20, 1977, while deceased was operating a 1972 Mazda sedan, traveling south on the Tenth Street viaduct between Charleston and Avery Streets in Lincoln, Nebraska. Defendant, who was operating a 2 ½-ton Ford pickup from the south, crossed the center line on the viaduct and collided head on with the deceased's automobile. The point of impact was 2 feet 6 inches west of the center line, over into deceased's traffic lane. The deceased's car was propelled backward to the north and into the guard rail on the west side of the viaduct. The car came to rest near the center of the road, almost 50 feet north of the point of impact. Following the collision, defendant's vehicle began to spin. It struck the curbs on both sides of the road several times. It came to rest some 320 feet north of the point of impact. The viaduct was covered with ice but the street on either side of the viaduct was only wet. It was stipulated that on the evening of March 19, 1977, commencing at about 10 p.m., Lincoln experienced a rapid cooling trend. Between approximately 10 p.m. and midnight, the temperature dropped from 32 degrees to 20 degrees Fahrenheit.

Prior to the impact defendant's vehicle left a skid mark in the ice caused by the application of his brakes. The skid mark started approximately 20 feet north from a power pole used as a reference line for measurement. It also started 20 feet prior to the point where it crossed the center of the roadway, and thereafter continued for 80 feet but faded 15 feet from the point of impact. The power pole or reference point was approximately 350 feet from the southwest corner of the viaduct so that defendant traveled approximately 480 feet on the viaduct to the point of impact.

The only living witnesses to the collision, the defendant and his passenger, were injured in the collision and have no recollection of it. Defendant testified his speed was approximately 30 to 35 miles per hour as he proceeded north on Tenth Street. Two other witnesses testified he passed their car, which was traveling 30 to 35 miles per hour, approximately 2 blocks before the approach to the bridge. One of the witnesses said he went flying by. The posted speed was 35 miles per hour.

Officer Kubicek of the Lincoln police department testified that about 11:30 p.m., on the evening of March 19, 1977, while on routine patrol, he drove over the viaduct. At that time he noticed ice forming on it caused him to lose traction. He radioed, suggesting that a sand crew be sent to the viaduct, but none ever arrived.

Christine Creal testified she approached the viaduct from the south at about 11 p.m. that evening. She did not observe anything unusual about the street conditions before reaching the viaduct. As she started up the incline, traveling about 30 miles per hour, her car began to swerve. The car spun completely around once or twice, before coming to a halt in the southbound lane. The car struck the curb on the west side of the viaduct. She had not had anything to drink that night.

Daniel Burbach testified he crossed the viaduct from the north at approximately 10:30 p.m., on March 19, 1977. The street to the north of the viaduct was wet but not icy. About halfway up the viaduct he slipped into the northbound lane. At the time he was traveling about 30 miles per hour. He had consumed three beers during the evening.

The first vehicle to arrive at the scene of the accident was an automobile driven by Bruce Maske. Maske testified defendant's vehicle passed him as he was driving north on Tenth Street, about 2 blocks south of the viaduct. He testified his speed was 30 to

35 miles per hour, and estimated defendant was traveling at least 5 miles per hour faster. In a statement given to the police after the accident he had said defendant was going 10 to 15 miles per hour faster. Maske did not see the collision. As he started up the viaduct, he hit a patch of ice and began to slide into the southbound lane. He then saw the car of the deceased in the middle of the road and managed to regain control and get around the car on the east side. He stopped his car between defendant's pickup and the car of the deceased. He testified the street south of the viaduct was not slick, although it had been snowing and misting all day. He had had two or three drinks during the evening.

Deonne Fuehring, a passenger in Maske's car, also did not see the collision. Because she was not looking at the road when they went up the viaduct, she did not realize they had swerved into the other lane or narrowly missed hitting the car of the deceased. When she got out of the Maske car to render assistance, she slipped and fell on the ice. As she approached the defendant's car, she said, "Bruce, that's the same pickup and it's headed the other way now."

Jolene Kreifels was the next person to approach the viaduct from the south. She testified Tenth Street was not slippery, although it was wet. She started up the viaduct at about 30 to 35 miles per hour. As she neared the top she saw deceased's vehicle in the middle of the road. She took her foot off the accelerator and her car began to slide out of control. The car swerved to the right and hit the viaduct. The car then spun completely around. It came to a stop about one car length from the car of the deceased. When she got out of her car, she nearly fell down as the road was very slick.

Robert Kubicek, one of the officers called to the scene of the accident, testified the defendant was under the influence of alcoholic liquor. He stated

defendant appeared uncoordinated, his speech was slurred, and he had a strong odor of alcohol on his breath. Defendant asked him "Wow man. What'd I hit?" He continuously repeated this question although the officer had answered it. The officer was of the opinion the defendant was under the influence to the point he was physically impaired. The officer testified the viaduct was slick from ice, and fog was beginning to form. He had to walk slowly to avoid falling down.

The officer who made the measurements at the accident scene testified the viaduct was slippery enough to make it difficult to drive on it. The parties stipulated defendant's blood alcohol level was sixteen-hundredths of one percent. The test was taken 45 minutes after the impact. The blood alcohol level of the deceased was three-hundredths of one percent. The deceased died as a result of injuries sustained in the accident.

Doctor Orin Hayes, a physician, testified a person having a blood alcohol level of sixteen-hundredths of one percent would be decidedly under the influence. At that level motor coordination and judgment would be affected to a prominent degree. His sight and other faculties would be affected.

Defendant's argument that the evidence is insufficient to sustain his guilt is premised on his theory that the accident was a natural and unavoidable consequence of the viaduct being covered with ice. To sustain this point, he calls attention to the fact that other cars had great difficulty in stopping, some drivers momentarily losing control of their vehicle. In fact, one car hit the bridge abutment in an attempt to avoid a collision with the deceased's Mazda.

The burden was on the State to prove that the unlawful act charged, operating a motor vehicle when defendant had ten-hundredths of one percent or more by weight of alcohol in his body fluid, was a

proximate cause of decedent's death. The evidence adduced is circumstantial. It is sufficient to prove that the alcohol level in defendant's body was an important link in the cause of decedent's death. Our rule on the sufficiency of circumstantial evidence is as follows: "To justify a conviction on circumstantial evidence it is necessary that the facts and circumstances essential to the conclusion sought must be proved by competent evidence beyond a reasonable doubt, and when taken together must be of such a character as to be consistent with each other and with the hypothesis sought to be established thereby, and inconsistent with any reasonable hypothesis of innocence." State v. Keeton, 199 Neb. 405, 259 N. W. 2d 277 (1977).

In State v. Partee, 199 Neb. 305, 258 N. W. 2d 634 (1977), we said: "In determining the sufficiency of evidence to sustain a conviction, however, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence." Those matters are for the trier of fact.

Defendant had a concentration of sixteen-hundredths of one percent or more by weight of alcohol in his body fluid 45 minutes after the impact. A medical witness testified that a person with this concentration of alcohol would be decidedly under the influence. His motor coordination and judgment would be affected to a prominent degree. His sight and other faculties would be affected. A trained police officer called to the scene of the accident testified defendant was under the influence of alcoholic liquor. He stated defendant appeared to be uncoordinated, his speech was slurred, and he had no idea what he had hit. There can be little question but that the trier of fact could reasonably find the defendant had a sufficient quantity of alcohol to be physically impaired.

Accepting the fact that the viaduct was extremely

icy on the evening in question, the defendant traveled 480 feet on that ice to the point of impact. He testified he was traveling at the speed limit, but traveling 35 miles an hour for 480 feet on an icy surface would also indicate an impairment of judgment. The unlawful act with which defendant is charged is not speeding, although the evidence is ample to have permitted the trial court to have concluded that defendant was driving at an excessive speed. The testimony of the witnesses, the force of the impact after a skid of approximately 90 feet, the fact the car defendant had passed 2 blocks from the bridge, which was traveling between 30 and 35 miles an hour, was not close enough to hear or see the impact, would indicate excessive speed.

As the trial judge reasoned, defendant's condition was undoubtedly responsible for the speed, considering the condition of the surface. It must also be observed that all other cars which approached the bridge at the speed limit were able to bring their cars under control without colliding with another vehicle. The Maske car, after a skid, was able to drive around the decedent's vehicle and to stop midway between that vehicle and the defendant's pickup. Jolene Kreifels, after she saw the defendant's vehicle, although with some difficulty, was able to stop within a car length of it.

The medical witness testified that the defendant's faculties would be impaired. Defendant should have seen the reflection from the decedent's headlights, as he entered on the viaduct. That he did not is evident from the fact he did not know what he had hit. From the physical evidence, particularly the force of the impact, the trial court reasonably could have assumed the defendant made no attempt to control his vehicle until he had traveled approximately 370 feet on the slick surface of the viaduct, that being the point where the skid mark starts.

Occupants of both vehicles received serious injur-

ies. The autopsy report indicates that the deceased had multiple internal injuries. These injuries included rupture of the heart, and multiple skeletal fractures, with additional injury to the lung and liver. Cause of death was multiple injuries secondary to the automobile accident. On the record, we can say the evidence was sufficient to permit the trier of fact to find that defendant's condition was a proximate cause of decedent's death. We cannot say the District Court was incorrect in the conclusion reached. This court will not interfere on appeal with a conviction based upon evidence unless it is so lacking in probative force that the court can say as a matter of law that it is insufficient to support a verdict of guilt beyond a reasonable doubt. State v. Olson, 200 Neb. 341, 263 N. W. 2d 485 (1978).

The judgment is affirmed.

AFFIRMED.