STATE OF NEBRASKA, APPELLEE, V. ALLEN DEAN MILLER, APPELLANT.

328 N.W.2d 769

Filed January 7, 1983. No. 81-698.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger, for appellant.

Paul L. Douglas, Attorney General, and Terry R. Schaaf, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

PER CURIAM.

The defendant was convicted of motor vehicle homicide and sentenced to imprisonment for 1½ to 5 years. He has appealed and assigns as error the admission into evidence of the results of a blood test made following the accident, the admission of rebuttal testimony offered by the State, and the instructions to the jury.

The record shows that at about 10:30 p.m. on April 30, 1981, the defendant was operating a motorcycle in a westbound direction on Maple Street in Omaha. At the intersection of 63rd and Maple Streets, the motorcycle collided with a pedestrian, Marguerite Bostrom. Mrs. Bostrom suffered severe head and internal injuries and was pronounced dead at Immanuel Hospital.

Miller was also injured in the accident and was taken to the Methodist Hospital emergency room where he was questioned by a police officer, who detected alcohol on Miller's breath. Miller was then arrested for operating a motor vehicle while under the influence of intoxicating liquor. The officer read Miller the Nebraska implied consent advisory form and advised him of his *Miranda* rights. The officer also advised Miller that he could choose either a blood or a urine test to determine the level of alcohol in his system. Miller chose a blood test.

A hospital technician was directed to draw a blood sample, and the sample was taken by the officer to police headquarters and refrigerated. The time elapsed between the taking of the sample and refrigeration was about 1½ hours. The chemist who tested the sample testified that on May 4, 1981, a blood alcohol level of 0.14 percent was measured. A retest on May 18, 1981, showed the level to be 0.15

percent. The chemist indicated that there was not a true deviation between the test results.

The evidence as to the blood test was received over objection at the trial. The defendant contends the evidence was not admissible because (1) the defendant was not advised that he could choose to have a separate test performed by the physician of his choosing and (2) the test as performed did not meet Department of Health regulations, in that no anticoagulant or preservative was present in the sample and that the chemist failed to use potassium carbonate in the testing.

Neb. Rev. Stat. § 39-669.09 (Reissue 1978) provides in part: "The law enforcement officer who requires a chemical blood, breath, or urine test pursuant to section 39-669.08 may direct whether the test shall be of blood, breath, or urine; *Provided,* that when the officer directs that the test shall be of a person's blood or urine, such person may choose whether the test shall be of his blood or urine. The person tested shall be permitted to have a physician of his choice evaluate his condition and perform or have performed whatever laboratory tests he deems appropriate in addition to and following the test administered at the direction of the law enforcement officer."

In *Zadina v. Weedlun,* 187 Neb. 361, 190 N.W.2d 857 (1971), we held this statute does not require the officer to inform the person to be tested of his privilege to request an independent test. See, also, *State v. Wahrman,* 199 Neb. 337, 258 N.W.2d 818 (1977); *State v. Sommers,* 201 Neb. 809, 272 N.W.2d 367 (1978); *State v. Brittain,* 212 Neb. 686, 325 N.W.2d 141 (1982).

Rule 3 of the rules and regulations of the state Health Department, relating to analyses for the determination of the alcohol content of body fluids and the breath under the driving-while-intoxicated law, provides that blood samples must be collected in a container having an anticoagulant-preservative in it.

It is undisputed that the defendant's blood was collected in a tube which did not contain such a substance. Expert testimony was admitted through the chemist to the effect that the presence of the preservative inhibits yeast growth, which in turn might affect the alcohol content. On this particular sample, however, a test was performed and it revealed no presence of yeast. The expert witness further testified that in locally drawn and tested samples, refrigeration of the sample was more important than a preservative in guaranteeing reliable test results. A pathologist testified that whether the preservative was present or not made no difference in the test results.

In *State v. Fox,* 177 Neb. 238, 128 N.W.2d 576 (1964), we held that the effect of an improper amount of anticoagulant on the test results goes only to the weight and credibility of the evidence.

Rule 3 also regulates the types of methods approved for measuring blood alcohol. An approved method is termed direct injection into a gas chromatograph. This method requires the injection of an internal standard, but the addition of potassium carbonate is not required. The defendant argues that the tester's failure to use potassium carbonate while using a gas chromatograph violated rule 3.

The chemist called by the State testified that he used the method in which an internal standard was injected into the gas chromatograph. The evidence does not show noncompliance with the prescribed method.

We find no error in the admission into evidence of the results of the blood test.

On rebuttal the State was allowed to introduce testimony of an accident reconstruction expert indicating that the defendant's speed at the time of the accident was 70 m.p.h. The defendant argues this evidence was irrelevant and there was insufficient foundation for the testimony.

The manner in which the defendant operated his

vehicle was relevant to the charge. In *State v. Hilker,* 210 Neb. 810, 317 N.W.2d 82 (1982), we held that a violation of Neb. Rev.. Stat. § 39-669.07 (Cum. Supp. 1982) can be proven in any of three ways, among them operating a motor vehicle "while under the influence of alcoholic liquor." This phrase was defined in *O'Neill v. Henke,* 167 Neb. 631, 638, 94 N.W.2d 322, 329 (1959), as: " ' "[A] person is under the influence of alcoholic liquor if such person is under such influence of intoxicating liquor to such an extent as to have lost to an appreciable degree the normal control of his body or mental faculties, and to the extent that there is an impairment of the capacity to think and act correctly and efficiently." ' "

The defendant had introduced testimony as to the speed of the motorcycle. " 'In a criminal prosecution, any testimony, otherwise competent, which tends to dispute the testimony offered on behalf of the accused as to a material fact is proper rebuttal testimony.' " *Lipscomb v. State,* 162 Neb. 417, 420, 76 N.W.2d 399, 401-02 (1956). See, also, *State v. Pratt,* 197 Neb. 382, 249 N.W.2d 495 (1977).

The witness was experienced in accident reconstruction. He testified in response to a hypothetical question based on the following factors: (1) weight of the cycle and victim, (2) a test drive over the area, (3) review of the police and autopsy reports, (4) photographs taken, (5) weather and road conditions, and (6) resting place of the victim. This information was supported by the testimony of the witness and other witnesses.

In *Hawkins Constr. Co. v. Matthews Co., Inc.,* 190 Neb. 546, 558-59, 209 N.W.2d 643, 651 (1973), we stated: "In an overlapping argument the defendants assail the form of the hypothetical question and particularly because it omitted the testimony of Pechar, who observed the collapse. A hypothetical question should fairly reflect the proven facts. Great latitude is allowed the trial judge in ruling on admissibility of such a question. A hypothetical

question is not improper simply because it includes only a part of the facts testified to. Landis & Schick v. Watts, 84 Neb. 671, 121 N.W. 980. An expert witness in giving an opinion has a right to confine the facts that he recites to those which are believed to be true, or which are believed to be material to the issue. The question of what facts are relevant to the determination is one of the basic ones upon which experts in any given field may differ.''

The particular issue of expert testimony of vehicular speed was dealt with in *Herman v. Lee,* 210 Neb. 563, 570-71, 316 N.W.2d 56, 61 (1982), as follows: ''Since the adoption of the Rules of Evidence, opinions as to vehicular rates of speed have been elicited in two other cases before us. In *Nickal v. Phinney,* 207 Neb. 281, 298 N.W.2d 360 (1980), a licensed professional engineer with a degree in mechanical engineering and experience in accident reconstruction was permitted to testify as to the speed of plaintiff's motorcycle. His personal knowledge of underlying data included measurements, skid marks, degree of rotation of defendant's pickup, weight of vehicles, road surface conditions, coefficient of friction between the tires and the pavement, change of grade, and other facts. In *Belitz v. Suhr,* 208 Neb. 280, 303 N.W.2d 284 (1981), we held it was error to allow an investigating officer that arrived on the scene an hour after an accident to testify as a lay witness that plaintiff's speed exceeded what was safe for road conditions. The rule to be gleaned from these two cases is that an opinion of vehicular speed is proper, provided a sufficient foundation is laid to show the expertise of the witness, as well as specific knowledge of the underlying facts to deal with the question in issue.

''No exact standard is possible for fixing the qualifications of an expert or skilled witness, and the ruling of a trial judge receiving or excluding an opinion will be reversed on appeal only when a clear abuse of discretion is shown. *Northern Nat. Gas Co.*

*v. Beech Aircraft Corp.,* 202 Neb. 300, 275 N.W.2d 77 (1979); *Danielsen v. Richards. Mfg. Co., Inc.,* 206 Neb. 676, 294 N.W.2d 858 (1980); *State v. Loveless,* 209 Neb. 583, 308 N.W.2d 842 (1981)."

There was no abuse of discretion in the admission of the expert testimony. A sufficient foundation was laid showing both his qualifications and knowledge. The hypothetical question posed met the criteria set out in *Hawkins Constr. Co., supra.*

The defendant submitted a requested instruction based upon an interpretation of *State v. Gerber,* 206 Neb. 75, 291 N.W.2d 403 (1980), which was the same as that requested in *State v. Brittain,* 212 Neb. 686, 325 N.W.2d 141 (1982).

In the *Brittain* case we said at 693-94, 325 N.W.2d at 146: "Finally, the defendant objects to the court having given its own instruction No. 11, and refusing to give the defendant's requested instruction No. 1. These instructions relate to the requirements of *Gerber, supra* . . . . [T]he defendant's proposed instruction stated that if the jury found from the evidence that 'the State has failed to prove any one of these four facts you must totally disregard any testimony or evidence received regarding the blood test itself and the results of the blood test.'

"In refusing the defendant's offered instruction, the court relied upon *State v. Fox,* 177 Neb. 238, 249, 128 N.W.2d 576, 582 (1964), in which we said: 'It is obvious from the record that all the statutory foundational requirements for the admission of the result of the blood analysis have been met, and such evidence was competent and properly admitted. There is nothing in the statutes which, either expressly or inferentially, prohibits the use of an anticoagulant for the purpose of preserving the blood during the interim from withdrawal until the test. Any evidence to the effect that the alcoholic content of the defendant's blood might have been affected by the presence of an improper amount of anticoagulant in the test tube, or by the use of an antiseptic to cleanse

the arm before injection with the syringe and needle, would have no effect upon the admissibility of the test, but, rather, such evidence would go only to the weight and credibility of the test.'

"The defendant insists that *Fox, supra,* is no longer the law in Nebraska, having been overruled by the language of *Gerber, supra,* as set forth earlier in this opinion.

"We do not interpret *Gerber* in this fashion. Both cases deal with the reception of evidence, not proof of facts. Both cases impose certain foundational requirements before the test may be admitted. These requirements were satisfied in the case at bar. Neither case required that the jury reexamine the trial court's ruling on the admissibility of the tests. The defendant was not entitled to the proposed instruction and there was no error in refusing to give it."

The *Gerber* case requires compliance with *methods* of the state Department of Health. In rule 3, "method" is defined and distinguished from "technique" as follows: "(b) Methods and techniques approved by the Department of Health are defined as:

"i. *METHOD* means the name of the principle of analysis. The method may be a *LABORATORY METHOD,* which in these rules and regulations means a method of chemical analysis not using a specifically designed alcohol testing device.

"ii. *TECHNIQUE* means a set of written instructions which describe the procedure, equipment, and equipment preventive maintenance necessary to obtain an accurate alcohol content test result."

The requirements for the container in which the blood is drawn is a "technique" rather than a "method." Failure to comply with a technique is not a failure to prove a foundational element, but affects weight and credibility only. See, also, *State v. Scott,* 206 Neb. 451, 293 N.W.2d 114 (1980); *State v. Kolar,* 206 Neb. 619, 294 N.W.2d 350 (1980).

There being no error, the judgment of the District Court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

I take the opportunity to file a dissent in this case for the limited reason that I was not a member of the court when we decided the case of *State v. Wahrman,* 199 Neb. 337, 258 N.W.2d 818 (1977). Had I been a member of the court at that time, I would have joined in the dissent of Judges White and Mc-Cown. I specifically write now to express my view that I disagree with the rule of law first declared by us in *Zadina v. Weedlun,* 187 Neb. 361, 190 N.W.2d 857 (1971), and repeated again in *State v. Wahrman, supra,* to the effect that when an officer requests an individual to give either a blood or urine sample, pursuant to the provisions of Neb. Rev. Stat. § 39-669.09 (Reissue 1978), the individual need not be advised that the statute entitles the individual to have a physician of his choice present to evaluate his condition and perform or have performed whatever further laboratory tests he deems appropriate in addition to that requested by the officer. It is no longer generally acceptable in American jurisprudence to merely suggest that all persons are presumed to know the law and, therefore, nothing more is ever required. The underlying philosophy which motivated the U.S. Supreme Court to establish the *Miranda* warnings makes that clear. See *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). It does not appear to me to impose an unreasonable burden upon a police officer, who must in the first instance request the test, to further advise an individual that he has a right to select a physician of his choice to perform whatever laboratory tests the physician deems appropriate, particularly in view of the fact that, absent the accused's physician, the tests are conducted completely out of the view of the accused and the results establish the violation, with nothing more. Unless

the individual has been advised of his rights, I have difficulty in seeing how he can knowingly waive them. We have, in a host of cases, now made it clear that before an individual may waive a constitutional right, he must understand that he had that right in the first place and that he knowingly waived the right. See *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). I would opt for a rule which requires the officer to advise the individual of his rights under the provisions of § 39-669.09.

WHITE, J., joins in this dissent.